IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

OPINION AND ORDER

        Plaintiff,

06-cr-118-bbc

    v.

NANCY R. MALEK and
FARROKH MALEK,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Defendant Nancy Malek embezzled almost $500,000 from a Medical Staff Account at Meriter Health Services.  She was charged with mail fraud in violation of 18 U.S.C. § 1341 and convicted on her plea of guilty on June 13, 2006.  On August 24, 2006, she was sentenced to a term of imprisonment and ordered to make restitution to the victim in the amount of $499,337.48.  Since then, the government's efforts to enforce the restitution obligation have resulted in the recovery of only $23,175.74 from defendant.

Alleging that defendant transferred her interest in valuable properties to her husband to avoid having to make restitution, the government brought a three-count complaint against Nancy Malek and her husband, Farrokh Malek, seeking the avoidance of allegedly fraudulent

1

transfers from Nancy to Farrokh and a judgment for unjust enrichment and constructive trust against Farrokh.  Each count alleges a violation of a different subsection of 28 U.S.C. § 3304, which sets out the elements for fraudulent transfers made in relation to debts to the United States.

The case is before the court on the government's motion for summary judgment, which is opposed by defendant Farrokh Malek.  Farrokh did not file any proposed findings of fact in support of his position but stated in his brief that he was contesting some of the facts proposed by the government.  In a supplemental filing, dkt. #44, he acknowledged that he had not complied precisely with the court's procedures and asked for leave to file a new document, dkt. #46, setting out his disputes with the facts proposed by the government. That request was granted, prompting a request by the government to respond to defendant's proposals.  With the filing of that response, the motion is ready for decision.

From the facts proposed by the government and from defendant's responses to those proposed facts, I find that the following are both undisputed and material.

### UNDISPUTED FACTS

From April 11, 1977 to October 28, 2004, defendant Nancy Malek was employed at Meriter Health Services as a medical staff coordinator, whose work responsibilities included managing the Meriter Medical Staff checking account at M&I Bank of Madison.  From

December 1, 1991 through August 20, 2004, she embezzled $499,337.48 from this account. During this time, she wrote checks from the account payable to herself and to her creditors and those of her husband, defendant Farrokh Malek, for the couple's expenses.

Nancy Malek deposited checks either into the M&I Bank account that she and her husband held jointly, into her Heartland Credit Union Mastercard Account, into her Park Bank account or into her husband's Anchor Bank account. She spent the money in these accounts on family expenses and on expenses for the couple's internet businesses.

In the fall of 2003, Dr. Geoffrey Priest, Senior Vice President of Medical Affairs, asked Nancy Malek for the bank account records for the Meriter Medical Staff checking account. She told him she did not keep bank statements. At some time, Dr. William Hisgen, Vice President of Medical Affairs, asked Nancy whether the hospital had audited the Medical Staff checking account; she assured him that it had been. On June 9, 2004, Dr. Hisgen learned from Meriter's Director of Corporate Compliance and Internal Audit that Nancy's assurances were not true and that the account had not been audited.

Dr. Priest ordered the monthly bank statements for the Medical Staff account. In reviewing them, he noted substantial activity in the account, but it was not until he obtained copies of the checks from M&I Bank in August 2004, that he discovered that Nancy had been writing checks to herself and to her and her husband's creditors. Drs. Priest and Hisgen began asking Nancy for more details about the checking account.

3

On June 2, 2004, defendants sold their Four Winns boat to Nancy's daughter for $6,500, which Farrokh deposited into his Member's First Credit Union account. On July 12, 2004, both defendants satisfied the July 31, 2003 $30,000 home equity mortgage they had used to purchase their 2003 Lexus on August 18, 2003. On July 21, 2004, defendants refinanced their home at 917 Autumn Woods Lane, Oregon, Wisconsin, taking a $250,000 mortgage on the property. On July 27, 2004, they deposited $210,405.38 from the sale of the house into their joint account at M&I Bank. On August 20, 2004, defendants purchased a vacation property at 9 Frekletan Lane, Bella Vista, Arkansas, with a cashier's check in the amount of $210,048.33 drawn on their M&I account.

Between August 16 and August 20, 2004, Dr. Priest discovered Nancy's embezzlement. On August 23, 2004, he and Mary Nick, Meriter's Vice President of Human Resources, confronted Nancy and told her they had discovered that she had written checks to herself and to her and her husband's creditors. Meriter suspended Nancy from employment and sent her home pending further investigation of her misuse of the Medical Staff account. That evening, Nancy told Farrokh she had misused funds from Meriter. On August 24, 2004, Farrokh wrote a check from the couple's joint checking account to retain the law firm of Hal Harlowe & Associates to represent Nancy in criminal proceedings.

Starting in March 2004, Nancy made transfers to Farrokh from the Park Bank account. By December 2004, she had transferred $6,611. On October 4, 2004, she

4

executed a quit claim deed to Farrokh, deeding him her interest in the Bella Vista property they had purchased jointly on August 20.

On October 29, 2004, Meriter told Nancy she was terminated from her employment, effective October 28, 2004. On November 2, 2004, Farrokh filed a petition for divorce. As part of the Marital Settlement Agreement, Nancy transferred to Farrokh all of her rights, title and interest in valuable assets of the marital estate, including her interest in the Bella Vista property, the 2003 Lexus, the proceeds of the sale of their Four Winns boat in the amount of $6,500 and any bank accounts not in her name.

Nancy believed that the divorce and transfers were part of a plan to preserve the couple's property. She transferred her interest in the Bella Vista property to her husband so that the two of them would not have to give it up to creditors.

On May 25, 2006, plaintiff United States of America filed a one-count information in the District Court for the Western District of Wisconsin, charging Nancy Malek with mail fraud in violation of 18 U.S.C. § 1341. On June 13, 2006, Nancy entered a plea of guilty to one count of mail fraud. On August 24, 2006, the court entered a criminal judgment against her and ordered her to make restitution in the amount of $499,337.48 to Meriter Health Services, the victim of her embezzlement,

As of October 28, 2008, plaintiff has collected only $23,175.74 in restitution. It has been unable to liquidate certain property that Nancy owned during the course of her

5

embezzlement scheme because she transferred her interests in the property to her husband.

OPINION

The government has based its claims against defendants on several different statutory provisions.  In count I of its complaint, it relies on 28 U.S.C. § 3304(a), which terms any transfer fraudulent as to a debt against the United States if the transferor makes the transfer without receiving reasonably equivalent value in exchange and the transferor is becomes insolvent as a result of the transfer.  Under this statute, to prove a fraudulent transfer as to a debt to the United States, the government must prove that the debt to the United States arose before the transfer was made, that the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and that the debtor is insolvent at the time or became insolvent as a result of the transfer.  § 3304(a)(1)(A) and (B).

This statute is of no use to the government unless it can prove the first element, which is that the transfers were made *after* the debt to the United States arose.  28 U.S.C. § 3002(3)(B) defines "debt" for the purposes of chapter 176 of Title 28 (debt collection) as "an amount that is owing to the United States on account of . . . restitution."  Nancy became indebted to Meriter Health Services at the moment she embezzled the first dollar in 1991 and continuing into 2004, but she had no debt to the United States until the entry of the restitution order against her in 2006.  All of Nancy's challenged transfers were made *before*

6

she owed any money to the United States as restitution.

The government has argued that subsection (a)(1) of § 3304 applies when the transfer is made before the debt to the victim arises but it has not explained how this subsection of the statute can be read to refer to any debt other than one owing to the United States.  I can only conclude that this subsection does not apply to this case.  If the government has a case against defendants, it must make it under another provision of § 3304, as alleged in counts II and III of its complaint.

Section 3304(b)(1), which is the provision of § 3304 on which the government bases both counts II and III of plaintiff's complaint, applies to fraudulent transfers made by a debtor, just as § 3304(a) does, but it does not require that the transfer be made after the debt arose.  Instead, it applies to debts that arose before or after the transfer is made, so long as "the debtor makes the transfer . . . (A) with actual intent to hinder, delay, or defraud a creditor; or (B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor . . . (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." Subsection (2) of § 3304(b) lists eleven factors the court may take into consideration in deciding whether the government has proven actual intent.  Among these are such things as whether the transfer was to an insider, which as defined  in 28 U.S.C. § 3301(5)(A)(1) includes a relative of the debtor; whether the debtor retained possession or control of the

7

transferred property after the transfer; whether before the transfer was made, the debtor had been threatened with suit; whether the debtor became insolvent shortly after the transfer was made; whether the transfer occurred before or shortly after a substantial debt was incurred; and whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred.

The government contends that it can establish fraudulent transfers under either subsection (A) or (B) of § 3304(b)(1). As noted, subsection (A), the basis for count II, requires actual intent to defraud a creditor. This requirement is met by Nancy's admissions under oath that she made the transfers and agreed to a divorce as part of a plan to protect her property and not lose the ownership of it.

In addition to Nancy's admissions, the government has adduced other indicia of intent. First, Farrokh was Nancy's husband at the time of the transfers; therefore, he was an insider, as defined in 28 U.S.C. § 3301(5)(A)(i). Second, both Farrokh and Nancy had reason to believe that they would be sued after Nancy was terminated from her employment. (The statute refers to transfers made after "the debtor had been sued or threatened with suit." § 3304(b)(2)(D). The government has not proposed as fact that Nancy had been actually threatened with suit. It alleges in its brief that Meriter's legal counsel demanded in early October that Nancy repay the embezzled funds as part of any settlement. Plt.'s Br., dkt. #34, at 19. This would clearly satisfy subsection (D) had it been proposed as a fact.

8

Since it was not, I am ignoring it.)

Despite the lack of any factual ground for finding at this time that Nancy's knowledge of the possibility of suit meets the "threatened with suit" standard set out in the statute, the undisputed facts make it obvious that a reasonable person in Nancy's position would have anticipated that Meriter would take legal action to recoup the money she had stolen. Section 3304(b)(2) lists the threatened with suit factor as one to which consideration may be given, "among other factors," leaving it to the court to identify other factors that would support or rebut the implication of fraudulent transfer.  It is undisputed that Nancy's transfers to her husband occurred shortly after Nancy learned that her employers had caught her and after Farrokh became aware of Nancy's embezzlement and her suspension from employment.

It is undisputed that after Nancy made the transfers, she was left with insufficient funds to pay her obligations to Meriter and eventually to the government.  Therefore, she was rendered insolvent by the transfer of the assets.

It is undisputed that as part of a marital settlement agreement, Nancy transferred property to Farrokh that was of substantial value.  (The facts proposed by the government do not disclose what property she retained or its worth, if any, and Farrokh has not proposed any facts to fill the information gap.)  Nancy transferred a 2003 Lexus after the two had paid off the $30,000 still owing on it, the Bella Vista property that she and Farrokh had bought

9

with $210,048.33 from the proceeds of the refinancing of their Oregon home approximately 45 days before they made the Bella Vista purchase, and the $6,500 in proceeds from the sale of the Four Winns boat to her daughter. On the facts before the court, I have to conclude that the transfers were of substantially all of Nancy's assets.

Farrokh takes issue with the conclusion that Nancy transferred substantially all of her assets to him. He contends that the transfers left her with assets reasonably equivalent in value to those she transferred as part of the divorce settlement and that, in fact, Nancy retained more assets than she was entitled to under the terms of the parties' premarital agreement, For the sole purpose of addressing this argument, I will assume that Farrokh could prove that he entered into a premarital agreement with Nancy under which she agreed to a certain division of the value of the house they built in Oregon, Wisconsin (92% of the appreciation going to Farrokh, the return to each party of his or her share of the down payment and an equal division of the decrease in the mortgage balance) and that in the marital settlement agreement they executed in connection with the divorce, she retained the equity in the Oregon house, which at the time of finalization of the divorce in July 2005 was estimated to be approximately $108,000, and a car estimated to be worth $8,000, along with her Meriter retirement account and the balance in her 401(k) plan, miscellaneous household furnishings, personal goods and a doll collection. He estimates that after the divorce, Nancy retained total net assets worth $276,504, whereas Farrokh retained assets totaling $391,309,

10

of which $47,261 was an account he had inherited from his father and would not be considered a marital asset. (Of this amount, Farrokh estimates his vehicle as worth only $16,000 in July 2005, although he had paid off the remainder of a $30,000 loan on the car the year before.) Farrohk argues that, given the couple's premarital agreement, Nancy received considerably more than her share of the marital assets under the property settlement agreement.

Defendant's argument has several flaws. To begin, he looks upon the settlement agreement independently of Nancy's fraud, the resulting right of her creditors to recover the embezzled funds and his and Nancy's interest in preserving their assets. This is error. Even assuming, as I will for the sake of argument, that Nancy entered into this agreement of her own free will, fully understanding that Farrokh did not view their divorce as a sham, it does not follow that the imprimatur of the state court immunizes the agreement from scrutiny under § 3304. I agree with the view expressed by the court in United States ex rel. Hartigan v. Alaska, 661 F. Supp. 727 (N.D. Ill. 1987), that "the dissolution of marriage 'was certainly never intended to be a vehicle to effect a fraudulent end, or to transmute that which would otherwise be fraudulent into something lawful.'" Id. at 729-30 (quoting Wilkey v. Wax, 82 Ill. App. 2d 67, 74 (4th Dist. 1967)). See also United States v. Barrier Industries, Inc., 991 F. Supp. 678, 681 (S.D.N.Y. 1998) (quoting Hartigan).

The legitimacy of the agreement is highly questionable, first, because the property

11

division under the agreement was lopsided, even accepting as accurate the optimistic valuation of the Oregon house as of July 22, 2005. (Although neither party proposed as fact the price of the Oregon property when it finally sold in 2006, it appears that Nancy's proceeds were $10,805.64, or almost exactly one-tenth of the estimated equity as of July 2005 of $108,000.  It is true, as Farrokh argues, that the value of the property is to be determined as of the time of the transfer, but a subsequent sale can cast doubt on the accuracy of a prior contemporaneous estimate.)  Farrokh received $344,048; Nancy received only $276,504.

The agreement is suspect for another reason.  It does not take into account any of the money that Nancy stole from Meriter and used for the couple's living expenses or for purchases for herself and her husband.  It is undisputed that Nancy paid for her and her husband's routine expenses with money she had embezzled, making it possible for them to buy more things than they could have otherwise and to build up the value of their investments.  Without knowing how much of the embezzled funds went into the decrease in the mortgage balance on the Oregon house and the appreciation of the value of that house that made it possible to purchase the Bella Vista property or what part of those funds made it possible to buy the 2003 Lexus and the Four Winns boat, plus the other assets of the marriage, no one could evaluate the equities of the property settlement agreement.

Finally, there is the awkward matter of Nancy's having executed a quit claim deed to

12

the Bella Vista property to Farrokh in return for $1.00 on October 4, 2004, only 45 days after the two purchased the property, almost a month before Farrokh filed for divorce and nine months before the property was listed in the final divorce decree. Skeptics might view the inclusion of the Bella Vista property in the property settlement agreement as an attempt to disguise the transfer to make its fraudulent character less obvious.

Whatever the legitimacy or lack of legitimacy of the divorce agreement, the Bella Vista transfer would be voidable under § 3304(b)(1)(A) because it was to an insider; it was made after the Maleks reasonably feared having to repay the embezzling money and it left Nancy insolvent with respect to her debtors. Farrokh has made no attempt to show that Nancy received any consideration for this transfer beyond the $1.00 recited in the deed. It is possible that Nancy received as consideration a promise that any divorce he pursued would be a sham only. However, such a promise has no financial value as against a creditor. In re Hinsley, 201 F.3d 638, 644 (5th Cir. 2000) (value of transfer is determined from standpoint of creditors). See also Williams v. Marlar, 267 F.3d 749, 755-56 (8th Cir. 2001) (love and affection plus ten dollars is not reasonably equivalent value as to creditor). Nancy had the requisite intent; she made the transfer as a means of preventing her creditors from gaining possession of her share of the property.

To the extent that Farrokh is relying on his and his wife's premarital agreement to justify the uneven disposition of property, he has no legal basis for doing so. He cannot

13

assert that agreement against a creditor, such as Meriter or the United States, neither of which received notice of the agreement.  If, as he says, he and Nancy entered into the agreement in 1993, this was two years after Nancy had started embezzling from the Medical Staff Account.  Farrokh has adduced no evidence that he or Nancy gave Meriter notice of the premarital property agreement.  In the absence of notice, the agreement has no effect with respect to creditors.  Wis. Stat. § 766.55(4m) ((4m) (specifying in pertinent part that no provision of marital property agreement adversely affects interest of creditor unless creditor had actual knowledge of that provision when obligation to that creditor was incurred).

In summary, I am persuaded that the government has shown that Nancy Malek transferred valuable property to Farrokh Malek with actual intent to hinder, delay or defraud a creditor, Meriter Health Services, in violation of 28 U.S.C. § 3304(b)(1)(A).  As a consequence, her transfers of the Bella Vista property, the 2003 Lexus and the $6,500 in proceeds from the sale of the Four Winns boat are avoidable to the extent necessary to satisfy Nancy Malek's debt to the United States. 28 U.S.C. § 3306(a)(1).

I am less sure that Nancy Malek violated subsection (B) of 28 U.S.C. § 3304(b)(1) by transferring property without receiving a reasonably equivalent value in exchange for the transfer at a time when Nancy reasonably should have believed that she would incur debts beyond her ability to pay as they became due, simply because it is not clear to me that this

14

subsection is intended to apply to debts that have been incurred before the transfer is made. Because it is clear that Nancy's transfers violated subsection (A), it is not necessary to decide whether they also violated subsection (B).

For the sake of completeness, I will take up four of the affirmative defenses Farrokh asserted in his answer, even though he did not discuss them in his brief. The first relates to the statute of limitations, but it is clear that the United States brought this suit before the running of the period set out in 28 U.S.C. § 3306(b). The statute gives the government six years "after the transfer was made." Nancy's fraudulent transfers to her husband began in 2004; this suit was brought in 2008, well within the statutory period.

The second is Farrokh's assertion of a good faith defense, presumably under 28 U.S.C. § 3307. Such a defense requires a showing that the transferee took in good faith and for a reasonably equivalent value. For the reasons discussed above, Farrokh cannot make the showing of reasonably equivalent value and for obvious reasons, he cannot show that he took the property in good faith. He knew of Nancy's embezzlement before any of the transfers occurred, he knew of the likelihood that Meriter would try to recover the stolen funds and he continued to spend money in his and Nancy's bank accounts even after learning that the accounts were funded in large part by illegal proceeds. These are not the acts of a good faith transferee.

Farrokh's third defense is that the Bella Vista property was held by him and Nancy

15

as tenants by the entirety and for that reason, is immune from forfeiture.  The assertion does not stand up to scrutiny.  Under Arkansas law, tenants by the entirety have equal rights to the property, Banks v. Evans, 64 S.W.3d 746, 753 (Ark. 2002); the right to dispose of his or her interest in the property and a right of survivorship.  Morris v. Solesbee, 892 S.W.2d 281, 282 (Ark. Ct. App. 1995).   Each has the right to exclude others, to use the property and to receive income produced by it.  Id.  The Supreme Court has held that these rights are sufficient to subject either tenant's interest in the property to a federal tax lien.  United States v. Craft, 535 U.S. 274, 283 (2002) ("'in determining whether a federal taxpayer's state-law rights constitute "property" or "rights to property," [t]he important consideration is the breadth of the control the [taxpayer] would exercise over the property'") (quoting Drye v. United States, 528 U.S. 49, 61 (1999)).

Finally, Farrokh contends that any restitution obligation should be reduced by the amount of insurance that Meriter Health Services has received from its insurer.  He is wrong.  The plain reading of 28 U.S.C. § 3664(j)(1) is that an insurer is entitled to be made whole by the perpetrator of a fraud scheme or other financial crime, although payment is to be made first to the victim for any losses not covered by insurance and only after that to the insurer to reimburse it for any insurance payments disbursed to the victim.

ORDER

16

IT IS ORDERED that plaintiff United States of America's motion for summary judgment is GRANTED.  The transfers made by defendant Nancy Malek to her husband Farrokh Malek are avoided to the extent necessary to satisfy her debt to the United States. A hearing on the need for any additional remedies will be held on Thursday, January 8, 2009, at 11:00 a.m. in Courtroom 250.

Entered this 31st day of December, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

17